# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>JENNIFER CHRISTINA HALL,<br><br>    Defendant. | CASE NO. 07-CR-0619-L<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE** |

Presently before the Court is Defendant Jennifer Christina Hall's ("Defendant") Motion to Suppress Evidence Obtained from an Unlawful Immigration Stop ("Motion to Suppress Evidence"). After consideration of all the evidence, the Court finds: 1) that reasonable suspicion was not present when Border Patrol agents stopped Defendant's vehicle; and 2) there was no probable cause to arrest the Defendant. Accordingly, the Court **GRANTS** Defendant's Motion to Suppress Evidence.

## BACKGROUND

The following testimony was elicited at the July 3, 2007, evidentiary hearing. On March 3, 2007, Border Patrol Agent Craig Allen was standing on the shoulder of the westbound lanes of Interstate 8 approximately one half mile east of the Ribbonwood off-ramp.

At that time, Agent Allen was assisting other agents with an unrelated stop. He observed what he believed to be a blue Toyota minivan traveling westbound on Interstate 8. Agent Allen testified that the vehicle seemed to be struggling up the hill due to the noise it was making. Agent Allen looked at both the vehicle and the vehicle's driver. He noticed the driver was staring straight ahead with both hands on the steering wheel, which seemed unusual because the agents he was assisting on the side of the road had vehicles whose emergency lights were activated. Also, Agent Allen observed that all of the other traffic in the area appeared to acknowledge the other agents' as their emergency lights were shining on the side of the road.

Agent Allen specifically testified that "the sound that the vehicle was making, it seemed like it was carrying some weight." He noticed that the minivan exited at the Ribbonwood off-ramp and made a u-turn. The vehicle then proceeded back on the eastbound lanes of Interstate 8. Based on that activity, Agent Allen radioed in his observations noting there was a suspicious vehicle, which had just passed his location struggling up the hill, and had changed its direction of travel from westbound to eastbound on Interstate 8.

Agent Allen then began transporting the vehicle from the prior unrelated stop to the Border Patrol Station in a westbound direction on Interstate 8. Again, he observed the minivan vehicle, which was now traveling eastward on Interstate 8, opposite Agent Allen. He described the driver as a "white female with shoulder length hair" and believed the hair to be a bobbed haircut.

Agent Donald White and Supervisory Border Patrol Agent Mark Hansen heard Agent Allen's radio call. Agent White and Agent Hansen's vehicle were parked opposite one another, approximately one hundred yards south on Ribbonwood Road. Agent Hansen's vehicle was faced northbound and Agent White's vehicle was faced southbound. Agent Hansen immediately proceeded one hundred yards onto the Interstate in an attempt to locate the minivan. Agent White fell behind since he had to turn his vehicle around to get to the freeway entrance.

After traveling at a high rate of speed, Agent Hansen located the minivan. Agent Hansen was in civilian cloths in an unmarked Government vehicle. He testified that he pulled

alongside the vehicle, but due to the fact that he was lower than the minivan, he was unable to see past the driver.  He observed, however, that the driver of the minivan was intently looking into her rearview and side-view mirrors.  Agent Hansen testified that the driver appeared nervous, but he could not see any other bodies in the vehicle since his sedan was lower than the minivan.  Agent Hansen then proceeded ahead in order to lay down spikes, should that procedure become necessary.

During that time,  Agent White's marked patrol vehicle was approaching the Defendant's vehicle from the rear, about a quarter mile back.  Agent White testified that as he approached closer, he ran the plates and proceeded to pull up alongside the vehicle.

Agent White testified that since his truck was about two feet higher than the minivan, he was able to see into the passenger side and rear view tinted windows.  Agent White testified that he saw the driver and a front seat passenger who appeared to be crouching down between the seat and the dash area.  Agent White further testified that he could see in the back of the minivan and observed through the rear windows the bench area where several individuals were laying down in and between the seats.

Agent White activated his overhead lights and the driver pulled over and stopped.  Agent White asked the driver (later identified as the Defendant) if she knew the occupants and she responded "no."  According to Agent White, the Defendant stated "that she had picked them up."  When asked where, the Defendant allegedly pointed south.  Agent White asked if the Defendant ever picked up unknown individuals before.  The Defendant apparently stated that she had been arrested a couple times prior for alien smuggling.  She was subsequently placed under arrest.

### DISCUSSION

Although the above stated facts were pursuant to the testimony from the July 3, 2007, evidentiary hearing, subsequent dispatch tapes relating to the stop must be reconciled with the hearing testimony if reasonable suspicion is to be found.  The tapes indicate that Agent White, as he approached the minivan was not sure whether he had the right vehicle because it appeared white instead of blue.  Additionally, Agent White was instructed by Agent Hansen,

who was located further ahead, to pull the vehicle over. This instruction occurred before Agent White identified the suspicious behavior of the passengers.

Agent White's testimony that he ran the plates as he approached the minivan while driving at a high rate of speed was wholly contradicted by his later testimony that he ran the plates *after* he pulled Defendant's vehicle over to the side of the road. This is underscored by the dispatch tapes, which fully corroborate Agent White's subsequent testimony. The following dialogue occurred on the dispatch tapes:

| | |
|---|---|
| Agent Hansen- | O.K., I got her. I passed her. I'm [going to] get off and on if she continues eastbound. She's watching her rearview mirror pretty good. |
| Agent White- | O.K., [Agent Hansen] I'll just stay back then. |
| Agent Allen- | I don't know if it's loaded already guys, it was, it went by and it was struggling through (unintelligible) the sound. |
| Agent Hansen- | Hey [Agent White] go ahead and hit her up, let's take her down before she loads, maybe we'll get lucky, no license or something, we can get her off the road. |
| | . . . |
| Agent White- | Right here? |
| Agent Hansen- | Sure, light her up, I'll get off and then ahh, if she keeps going, I'll get back on. |
| Agent White- | Is this the right vehicle? This looks white. I'm behind the wrong thing, stand by. |
| Agent Hansen- | No. It looks white from the back, when you get up alongside of it, it's light blue. |
| Agent White- | Yeah, this is it, I just have to back up. |

The Court notes that Agent Allen is a supervisory Border Patrol Agent with twelve years of Border Patrol service. He has been assigned to this area for the last seven years. The location where he first observed the Defendant is approximately three to three and one-half miles from the Mexican Border. In Agent Allen's experience, there are loads of illegal aliens in that area on a daily basis. His original suspicion of Defendant's vehicle was based on: 1) his prior experience as an agent; 2) the defendant's actions while driving; and 3) the

apparent stress of the vehicle, which noted his attention. When Defendant passed his location without appearing to notice the Border Patrol vehicles whose lights were activated red, Agent Allen became suspicious. Defendant's actions of maintaining a straight forward gaze, coupled with the vehicle's u-turn and direction change to the opposite side of the freeway, increased Agent Allen's suspicions.

In addition, there was a Border Patrol checkpoint approximately 17 miles west of Agent Allen's location. In his experience, Agent Allen has found that smugglers generally tend to avoid the checkpoint if they can. Because of the observation of the minivan passing his location and the conduct of the driver, Agent Allen believed the vehicle needed a further look. That is why he made the radio call for further investigation.

Agent Hansen initiated the freeway pursuit, and was first to catch up with Defendant's vehicle. Agent Hansen, however, did not observe any individuals in the vehicle when he passed it. Clearly, Agent Hansen's comment in the dispatch tape stating "let's take her down before she loads" confirms that he did not believe the vehicle contained illegal aliens. This comment also came immediately after Agent Allen had radioed: "I don't know if it's loaded already guys."

Although Agent Allen's observation of Defendant and her vehicle, coupled with Agent Hansen's observations when passing Defendant's vehicle caused suspicion, the court finds that at that point there was insufficient "reasonable suspicion" to stop Defendant's vehicle because, by the agents' own words, they did not believe the vehicle contained illegal aliens at that point. Therefore if reasonable suspicion existed it must be based solely on Agent White's testimony.

Agent White, a Border Patrol Agent with five years of service, has been assigned to the Boulevard Border Patrol station during his entire tenure. Agent White testified that the area is a common area for smuggling. Agent White was in a marked Border Patrol Dodge pick-up truck with a cage on the back, but was located farther behind the pursuit since his vehicle was slower and needed to turn around before entering the freeway.

At the first hearing, Agent White testified that he pulled up beside Defendant's vehicle and was able to view inside the vehicle since his truck was higher than the Defendant's. He

1  also testified that he observed a passenger crouching down between the seat and the dash, and
2  he saw individuals lying in the back. Based on his experience, the crouching of the individual,
3  between the seat and the dash of the passenger seat, was consistent with the transportation of
4  illegal aliens. Agent White's observation of the crouching passenger, as well as observing the
5  number of people in the back of Defendant's vehicle, caused him to believe that he had
6  reasonable suspicion to stop Defendant's vehicle. He testified that because of this he activated
7  his lights and initiated a vehicle stop at the off-ramp. After confronting the driver and
8  obtaining her responses, there was probable cause to arrest.

9  The Court would concur that if Agent White's testimony was accurate, his observation
10 of the passengers coupled with Agents Allen and Hansen's observations would indeed lead to
11 a reasonable suspicion to stop the vehicle. However, the court must take into consideration
12 the dispatch tapes that were not made available until a considerable time after the hearing. The
13 dispatch tapes do not make the testimony clear cut. It is, however, obvious that Agent Hansen
14 wanted Defendant's vehicle stopped without any further information than that given by Agent
15 Allen.

16 Agent Hansen wanted the vehicle stopped at a time when he had no reason to believe
17 the vehicle was carrying illegal aliens. Agent Hansen's direction to stop the Defendant "before
18 she loads" is a clear admission that there was no current violation of law. The tape calls into
19 question Agent White's initial testimony that he pulled along side Defendant's vehicle while
20 on the Interstate. Specifically, the tape indicates that Agent White stated: "Is this the right
21 vehicle? This looks white. I'm behind the wrong thing, stand by." Agent Hansen responded:
22 "No. It looks white from the back, when you get up alongside of it, it's light blue."

23 The Court notes that Agent White did not describe his observations of the individuals
24 he saw within the vehicle in *any* recorded dispatch. Although he testified at the first hearing
25 that he did in fact radio his observations, he clarified his testimony at a subsequent hearing on
26 January 23, 2008. At that hearing, Agent White testified that his dispatch was on the internal
27 vehicle- to- vehicle radio, which was not subject to recording. He also clarified that his later
28 recorded dispatch explaining that it was a "good stop" came *after* the Defendant was pulled

over. Notably, the portion of the tape that reflects Agent White's response of "yeah, this is it, I just have to back up" is a little less than 37 seconds *after* Agent Hansen told Agent White "sure, light her up." Simply put, Agent White was already stopped at the off-ramp next to Defendant's vehicle when he responded to Agent Hansen's dispatch confirming that he had the right vehicle. This was also confirmed by Agent White's subsequent testimony. The dispatch tapes further confirm that Agent White ran the plates *after* the stop (not when he was behind the Defendant's vehicle on the freeway). Without the dispatch tapes, it would have been impossible to determine that Agent White's recollection to that fact was erroneous. Accordingly, that mistake calls into question Agent White's recollection that he observed the illegal aliens in the vehicle when he was on the freeway. The Court finds that it is far more likely that Agent White followed Agent Hansen's direction as a supervisory agent to "light her up" without personally observing any passengers in Defendant's vehicle.

Agent White consistently testified that he pulled up alongside the Defendant's vehicle on the off-ramp when he initiated the stop. It appears, therefore, more likely that it was at *that* time that Agent White personally saw into the Defendant's vehicle and it was at *that* time that he first viewed the individuals who were later identified as the illegal aliens. Also, given that Agent White was capable of hearing the dispatch dialogue that occurred between Agents Allen and Hansen, which reflected their opinions and observations that Defendant's vehicle was on the freeway unloaded, it does not seem reasonable that Agent White would pull up alongside the Defendant's vehicle on the freeway to ascertain a contrary opinion. It is far more likely that Agent White followed Agent Hansen's direction to stop the vehicle when Agent Hansen remarked ". . . maybe we'll get lucky, no license or something ,we can get her off the road."

Without Agent White's observation of the passenger and individuals in the back of the Defendant's vehicle *prior* to activating his overhead lights and initiating the stop, reasonable suspicion under the law does not exist. The Court does, however, acknowledge that many of the factors discussed in *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) are present. The area is: 1) well known for illegal alien smuggling; 2) the area is close to the border; 3) alien smugglers are caught daily in that area; 4) the Defendant's vehicle appeared to be straining

while going up a grade; 5) the Defendant's actions were suspicious by purposely ignoring a stop by other officers whose red lights were activated; 6) the Defendant drove by looking intently in her rear-view mirror; and 7) the Defendant ultimately reversed direction on the interstate. However, even despite these peculiar behaviors, none of the agents thought Defendant's vehicle contained illegal aliens. In Agent Hansen's own word, he stated: "Hey [Agent White] go ahead and hit her up, let's take her down before she loads, maybe we'll get lucky, no license or something, we can get her off the road."

Therefore, full consideration of all the evidence, the Court concludes that the observations of Agent White regarding the illegal aliens came *after* an illegal stop was initiated and not before.

## CONCLUSION

The Court finds: 1) that reasonable suspicion was not present when Border Patrol agents stopped Defendant's vehicle; and 2) there was no probable cause to arrest the Defendant. Accordingly, the Court **GRANTS** Defendant's Motion to Suppress Evidence.

**IT IS SO ORDERED.**

DATED: February 1, 2008

_____
M. James Lorenz
United States District Court Judge